IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ANDREW PAUL ROSHONE,

        Plaintiff,

    v.

HARRISON; HICKEY; BROOKS;
COLLETTE PETERS; M. GOWER;
S. SHELTON; J. RUSSELL;
L. WILLIAMSON; MARK NOOTH;
V. RODRIGUEZ; J. MORDHORST;
K. NEFF; N. JOHNSON;
R. WHITE; G. GULICK;
DR. PETERSON; POWELSON;
HUGHES; BUGHER; and JASON
BELL,

        Defendants.

2:14-CV-01576-BR

OPINION AND ORDER

ANDREW PAUL ROSHONE
1995 Amazon Parkway
Eugene, OR 97404

      Plaintiff, *Pro Se*

1 - OPINION AND ORDER

**ELLEN F. ROSENBLUM**
Attorney General
**VANESSA A. NORDYKE**
Senior Assistant Attorney General
1162 Court Street N.E.
Salem, OR 97301-4096
(503) 947-4700

        Attorneys for Defendants


**BROWN, Judge.**

     This matter comes before the Court on Defendants' Motion
(#55) for Summary Judgment.  For the reasons that follow, the
Court **GRANTS** Defendants' Motion.


**BACKGROUND**

     The following facts are taken from Plaintiff's Complaint and
the parties materials related to Defendants' Motion for Summary
Judgment and are viewed in the light most favorable to Plaintiff.

     At all relevant times Plaintiff Andrew Paul Roshone was an
inmate at Snake River Correctional Institution (SRCI).

     On August 26, 2013, Defendant Corrections Officer Kraig
Brooks was delivering supplies to inmates housed in the Intensive
Management Unit (IMU) of SRCI.  When Officer Brooks reached
Plaintiff's cell, he dropped the cuff port[1] to pass supplies to
Plaintiff's cell.  Plaintiff told Officer Brooks that he wanted

---

     [1] A cuff port is a "port or window" into a cell through
which items such as food, toilet paper, and other supplies are
passed to inmates.  Plaintiff's cuff port was 16 inches wide by
six inches high.

2 - OPINION AND ORDER

to speak with a sergeant about being denied a shower.  Officer Brooks advised Plaintiff that he could speak to a sergeant when the sergeant made rounds.  When Officer Brooks began to close the cuff port, Plaintiff "suddenly" pushed the cuff port open and "thrust his arms" through the cuff port in what Officer Brooks perceived as an attempt to grab and/or to hit him.[2]  Officer Brooks called for backup.  Defendant Correctional Officer Chad Hickey responded to Officer Brook's call for backup, took hold of Plaintiff's arms, and tried to push them back into the cell. Officers Brooks and Hickey ordered Plaintiff to pull his arms back into his cell, but Plaintiff refused to do so.  Officers Brooks and Hickey then disengaged and waited for more security staff to arrive.  "Soon after" Sergeant Johnson arrived with other correctional officers.  Sergeant Johnson had a hand-held video camera with him recording his contact with Plaintiff. Sergeant Johnson ordered Plaintiff to pull his arms back into his cell.  Plaintiff complied with Sergeant Johnson's order. Plaintiff also complied with Sergeant Johnson's "cuff up" order. When Plaintiff was secured with restraints, he was "escorted from the unit" to the Segregated Housing Unit (SHU).

When he reached SHU on August 26, 2013, Plaintiff was seen by Nurse Judy Bradford, who noted Plaintiff had red marks on his

---

[2] In his Complaint Plaintiff refers to this as taking "the cuff port hostage."

right forearm.  Plaintiff, however, was able to wiggle all of his fingers "easily," to lift and to lower his wrists, to make circles with his wrists, and to turn the palms of his hands up and down without any indication of pain.

At some point on August 26, 2013, after Plaintiff's arrival at SHU, Defendant Lieutenant Jerry Mordhorst advised Plaintiff "that at no time, should he ever reach out of the cuff port at staff.  We view this as an attempted assault and staff will react."  Decl. of Jerry Mordorst, Ex. 1 at 2.

On August 27, 2013, Plaintiff was seen by Nurse Judy Williams and denied any further injury.  Nurse Williams advised Plaintiff to return to sick call as needed.

On August 31, 2013, Defendant Corrections Officer Stuart Harrison asked Plaintiff whether he needed any supplies.  Officer Harrison testifies in his Declaration that Plaintiff told him that he needed supplies, "but [he] began cursing and threatening [Officer Harrison] with harm if he were to use the cuff-port device."[3]  Decl. of Stuart Harrison at ¶ 7.  Nevertheless, Officer Harrison used the cuff-port device and provided Plaintiff with the supplies he requested "without incident."  Id.

Plaintiff alleges in his Complaint that on August 31, 2013, he asked Officer Harrison to place Plaintiff's dinner in the

---

[3] Officer Harrison also refers to this as the "cuff-port restriction device" and explains only that it is "on a rolling cart."

4 - OPINION AND ORDER

cuff-port restriction device "by [Plaintiff's] door rather than
the one by [his] next door neighbor's cell, since he was being
accused of throwing feces at a CO." Compl. at ¶ 9. Plaintiff
alleges Officer Harrison refused and denied him dinner.
Plaintiff, therefore, asked Officer Harrison to call the Sergeant
"so we could resolve this issue several times but he refused to,
so at about 6:30 p.m. [Plaintiff] took the cuff port and the
restriction device hostage." Compl. at ¶ 10. Officer Harrison
testifies in his Declaration that at dinner time on August 31,
2013, he ordered Plaintiff to stand against the back wall of his
cell, and he prepared to use the cuff-port device to provide
Plaintiff with his evening meal. Plaintiff, however refused to
comply with Officer Harrison's order. Plaintiff, therefore, was
not provided with his evening meal and "continued with his
cursing and threatening behavior." *Id*.

Later on August 31, 2013, when Officer Harrison was alone in
Plaintiff's unit, Plaintiff began kicking his door and screaming
that he needed toilet paper. Officer Harrison contacted the
"sub-control officer," Officer Beaumont, and notified him that
Officer Harrison was going to deliver a roll of toilet paper to
Plaintiff. Officer Harrison asked Officer Beaumont to "keep an
eye on [Plaintiff] as a result of his pattern of behavior . . .
[and] history of violence towards staff and inmates." Harrison
Decl. at ¶ 8. Officer Harrison describes the events in his

Declaration as follows:

> I utilized the cuff-port device and opened the
> cuff port, after having directed [Plaintiff] to
> get against the back wall.  The moment the cuff
> port was opened, [Plaintiff] quickly dove to the
> port with sufficient force to cause the cuff-port
> restriction device . . . to move backwards far
> enough for [Plaintiff] to get his arms thru [sic]
> the port and begin grabbing at me.
>
> * * *
>
> I grabbed ahold of [Plaintiff's] right arm and
> stepped to his left and to the side of the cuff
> port.  At this same time the sub-control officer
> notified staff that I was engaged in an
> altercation with an inmate and that backup
> officers were required.  There was . . . a short
> delay in the response of back up and while I
> waited for other corrections staff to arrive, I
> maintained control of [Plaintiff's] arm [using]
> . . . a "reverse wrist lock", which meant holding
> [P]laintiff's arm against his body (but not
> against the edge of the cuff port) and rotating
> [Plaintiff's] forearm to the right slightly.  This
> wrist lock was intended to control [Plaintiff],
> not to cause injury to [Plaintiff]. . . .  I used
> the wrist lock so that I could control
> [Plaintiff's] arm with one hand, leaving my other
> hand free to access my cap-stun (chemical pepper
> spray).
>
> I accessed my chemical pepper spray with the
> intention of delivering a short blast to the face
> of [Plaintiff] to prevent him from continuing to
> struggle and fight with the backup officers when
> they arrived and removed him from his cell.  As I
> brought my capstun towards the cuff port,
> [Plaintiff] saw the canister and screamed "NO" and
> pulled back with great force. . . .  I pulled back
> in the opposite direction to prevent my arm from
> going inside the cell, because I believed
> [Plaintiff] would cause serious injury to my arm
> if he had access to it inside his cell. . . .  It
> was at this moment that I heard a loud "pop",
> which I surmised was [Plaintiff]'s arm breaking.

6 - OPINION AND ORDER

Harrison Decl. at ¶¶ 9-11.

After the incident on August 31, 2013, Plaintiff was seen by Nurse Erin Emmert, who splinted Plaintiff's right arm to immobilize it while he was transported to the hospital.

On August 31, 2013, Plaintiff was admitted to the emergency room of the Saint Alphonsus Medical Center.  X-rays of Plaintiff's arm showed Plaintiff had a spiral fracture of the "mid to distal right humerus with mild displacement and without dislocation at the shoulder."  Jason Wilhemsen, M.D., ordered Plaintiff to keep his arm in a splint and immobilized and to follow-up with an orthopedic surgeon within four to five days. Plaintiff was discharged with instructions to take Norco (an acetaminophen-Hydrocodone combination) every six hours as needed.

On September 1, 2013, at 12:05 a.m. Plaintiff returned to SRCI.  Plaintiff's discharge instructions were given to Inmate Health Services and Plaintiff was provided with pain medication. At 12:30 p.m. Plaintiff reported to Nurse Megan Ashton that the pain medication he had received was effective.

On September 3, 2013, Defendant Garth Gulick, M.D., saw Plaintiff, who complained of breakthrough pain on Norco. Dr. Gulick prescribed MS Contin twice a day for pain and ordered an appointment for Plaintiff with Defendant Randolph Peterson, M.D., to evaluate Plaintiff's arm to determine whether surgery

and "open reduction internal fixation (ORIF)[4] would be necessary."  Decl. of Garth Gulick at ¶ 11.

On September 4, 2013, Dr. Peterson reviewed Plaintiff's August 31, 2013, x-ray and diagnosed Plaintiff with a spiral fracture to his right humerus.  Dr. Peterson noted "the medial shaft is in an excellent position" and directed Plaintiff to continue wearing the splint and to keep his arm immobilized. Dr. Peterson ordered Plaintiff to undergo follow-up x-rays in 1-2 weeks and noted it would require surgery to repair if Plaintiff's fracture "displaced."  Gulick Decl. at ¶ 12 and Ex. 1 at 8.

Plaintiff was seen by various doctors and other medical staff at SRCI for treatment related to his right-arm fracture at least 14 times between September 2013 and May 2014.  Plaintiff underwent x-rays of his right arm four separate times between September 2013 and May 2014.  All of his x-rays showed normal healing with only "slight malalignment" within acceptable medical parameters.

On October 6, 2014, Plaintiff filed a *pro se* Complaint in this Court pursuant to 42 U.S.C. § 1983 in which he alleges during his time as an inmate at SRCI, Defendants (1) violated Plaintiff's Fourteenth Amendment rights when they did not allow Plaintiff "due process before assaulting and subjecting him to

_____

[4] ORIF involves implanting "fixators" such as bone screws, metal plates, pins, and/or rods to repair a broken bone.

serious pain and injury," (2) violated the First Amendment to the
United States Constitution when they did "not call[] a supervisor
when Plaintiff asked . . . and . . . retaliat[ed] against
Plaintiff for attempting to exercise his [F]irst Amendment rights
with the use of excessive force," and (3) were deliberately
indifferent to his serious medical needs in violation of the
Eighth Amendment when they denied him appropriate medical care.

On January 22, 2016, Defendants filed a Motion for Summary
Judgment as to all of Plaintiff's claims.

On January 25, 2016, the Court issued a Summary Judgment
Advice Notice to Plaintiff advising him that if he did not submit
evidence in opposition to Defendants' Motion, summary judgment
would be entered against him if appropriate.

On May 2, 2016, Plaintiff filed a Response to Defendants'
Motion for Summary Judgment.  The Court took this matter under
advisement on May 19, 2016.


## STANDARDS

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." *Washington Mut. Ins. v. United
States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  *See also* Fed. R.
Civ. P. 56(a).  The moving party must show the absence of a
dispute as to a material fact. *Rivera v. Philip Morris, Inc.*,

9 - OPINION AND ORDER

395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly
supported motion for summary judgment, the nonmoving party must
go beyond the pleadings and show there is a genuine dispute as to
a material fact for trial.  *Id.*  "This burden is not a light one
. . . .  The non-moving party must do more than show there is
some 'metaphysical doubt' as to the material facts at issue."  *In
re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)
(citation omitted).

A dispute as to a material fact is genuine "if the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party."  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d
1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all
reasonable inferences in favor of the nonmoving party.  *Sluimer
v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary
judgment cannot be granted where contrary inferences may be drawn
from the evidence as to material issues."  *Easter v. Am. W. Fin.*,
381 F.3d 948, 957 (9th Cir. 2004)(citation omitted).  A "mere
disagreement or bald assertion" that a genuine dispute as to a
material fact exists "will not preclude the grant of summary
judgment."  *Deering v. Lassen Cmty. Coll. Dist.*, No. 2:07-CV-
1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011)
(citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.
1989)).  When the nonmoving party's claims are factually

implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

## DISCUSSION

Defendants move for summary judgment on all of Plaintiff's claims on the grounds that (1) Plaintiff has failed to allege personal involvement by Defendants Nooth, Neff, Mordhorst, Johnson, Shelton, Williamson, Peters, Gower, White, and Bell; (2) Plaintiff has not established Defendants violated his right to due process; (3) Plaintiff has not established Defendants used excessive force; and (4) Plaintiff has not established he received inadequate medical care.

## I.   Personal Involvement

As noted, Defendants move for summary judgment on Plaintiff's claims against Defendants Nooth, Neff, Mordhorst, Johnson, Shelton, Williamson, Peters, Gower, White, and Bell on the ground that Plaintiff has failed to establish these Defendants personally participated in the conduct underlying

Plaintiff's claims.

The Ninth Circuit has made clear that "'[l]iability under § 1983 must be based on the personal involvement of the defendant. There is no *respondeat superior* liability under section 1983.'" *Shallowhorn*, 572 F. App'x at 546 (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)). Plaintiff does not allege or establish any facts that suggest Nooth, Neff, Mordhorst, Johnson, Shelton, Williamson, Peters, Gower, White, or Bell personally participated in the alleged deprivation of Plaintiff's medical care.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's claims against Nooth, Neff, Mordhorst, Johnson, Shelton, Williamson, Peters, Gower, White, and Bell.

## II.  Plaintiff's Claim for Denial of Due Process

Plaintiff alleges Defendants violated his Fourteenth Amendment right to due process "by not allowing Plaintiff due process before assaulting and subjecting him to serious pain and injury" and "by establishing an unwritten policy allowing officers to use 'reactionary force' instead of following procedures."

Plaintiff does not specifically state in his Complaint whether he is alleging a claim for substantive or procedural due process. The Court, however, infers Plaintiff intends to assert a claim for procedural due process based on the allegations in

his Complaint.

The Supreme Court has made clear that the Due Process Clause of the United States Constitution "encompasses . . . a guarantee of fair procedure." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Accordingly, an inmate may bring an action for a violation of procedural due process. "In procedural due process claims, [however,] the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Id*. (quotation omitted)(emphasis in original).

> The constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate. This inquiry would examine the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation.

*Id*. at 126.

Contrary to the allegation in Plaintiff's Complaint that Defendants have established an "unwritten" policy allowing the use of reactionary force, Oregon Department of Corrections (ODOC) has a number of regulations permitting the use of reactionary force and governing its use. Specifically, Oregon Administrative Rule 291-013-0010(21) defines Reactive Use of Force as "[t]he use

of force in situations where time and circumstances do not permit approval by higher ranking employees, or consultation or planning."  Rule 291-013-0080(1) and (2) provide:

> (1) Reactive use of force will be allowed for situations where time and circumstances do not permit approval by a supervisor or consultation or planning.
>
> (2) Employees may use any available equipment or weapons to prevent the loss of life or serious bodily injury, if no other reasonable alternative or time is available.

Accordingly, ODOC Regulations specifically permit the use of reactive force when "time and circumstances do not permit" an officer to obtain approval of or consultation with a supervisor before using force.  In his Declaration Captain Thomas Jost testifies at the time of the August 31, 2013, incident that

> it was common knowledge amongst SRCI correctional officers that inmates can do many things to cause harm or endanger an officer via the cuff-port. While not a completely inclusive list, the following has occurred at SRCI via inmate cuff-ports:  (1) Inmate stabbing or attempting to stab an officer; (2) Inmates "poking" at officers with other items in an attempt to injury the staff; (3) Grabbing a correction officer's arm and drawing the arm in to the cell in an attempt to break the officer's arm; (4) throwing items at the officer through the cuff-port, such as filling a plastic baggie or cup with human waste and then tossing it through the cuff-port at an officer in an attempt to soil them or infect them with various types of diseases.
>
> 10.  Correctional officers carry a variety of tools on their duty belts that could be seized by an inmate.  These tools include: hand cuffs, cuff keys, facility keys, Q.C. (or cap-stun) spray, radios and what is referred to as "the pipe".

11.  The pipe is a device that resembles a small baton and is used by correctional staff to document their tier-check times via a scanning device implanted in the "pipe".  While not as dangerous as a full-sized police baton, the item could be used to injury others.

12.  O.C. or "cap-stun" spray can be used to incapacitate a staff member.

13.  Cuffs can be used as both impact and stabbing weapons, cuff keys secreted by inmates could be used for escape attempts and the like, as could facility keys and a radio can easily be used as an impact weapon or additionally as a method to gather Intel on tactics which may be about to be deployed against said inmate.

14.  Cuff-ports like the one on [Plaintiff's] cell posed safety risks to correctional officers. For instance, an inmate could crash the door of his cell and impart force on the restriction device resting against it, thereby causing the device to push back from the cuff port and allow the inmate to reach through and grab at the officer, try to steal items off the officer's duty belt, or throw something at the officer.

Decl. of Thomas Jost at ¶¶ 9-14.  Captain Jost also testifies:

[I]t was common knowledge among SRCI correctional officers that [Plaintiff] had attempted to attack or grab Officers Brooks and/or Hickey during a previous encounter . . . as a result of the "cuff-port restriction" notation on the cell placard [and due to] daily [staff briefings] . . . .  During these briefings, the issues surrounding [Plaintiff's] propensity for violence and the cuff-port restriction were discussed.

Jost Decl. at ¶ 7.  Officer Harrison testifies he had been

briefed on Defendant's "attempted assault" of Officers Brooks and

Hickey on August 26, 2013, and he was

aware that [Plaintiff] had been previously charged with Staff Assault for assaulting Officer Olive on

15 - OPINION AND ORDER

> August 11, 2010.  I was also aware of six previous
> disciplinary rule violations by [Plaintiff] for
> Inmate Assault, two of which ended in a medical
> trip for the inmate that [Plaintiff] assaulted.

Decl. of Stuart Harrison at ¶¶ 5-6.  The record also reflects at
the time that Plaintiff reached out of the cuff port and
attempted to grab Officer Harrison, Officer Harrison was alone on
the floor and did not have ready access to a supervisor to
consult regarding Defendant's actions.  Officer Harrison
testifies he "truly believed that [Plaintiff] was attempting to
either injure him or trying to grab a possible weapon from [his]
duty belt."  Harrison Decl. at ¶ 10.  Thus, the record reflects
Harrison was aware of Plaintiff's August 26, 2013, interaction
with Officers Brooks and Hickey as well as several prior charges
against him for assaulting officers and inmates; Officer Harrison
believed Plaintiff was attempting to either injure Officer
Harrison or to grab a potential weapon; and, as noted, Officer
Harrison was alone on the floor.  Viewing this record in the
light most favorable to Plaintiff, the Court concludes the fact[5]
Officer Harrison used reactive force against Plaintiff was in
accordance with ODOC regulations, and, therefore, Plaintiff's Due
Process claim fails as a matter of law.

Accordingly, the Court grants Defendants' Motion for Summary

---

[5] The degree to which Officer Harrison's conduct may have
involved unconstitutionally excessive force in violation of the
Eighth Amendment is not affected by this determination.

Judgment as to Plaintiff's Due Process Claim.

## III. **Plaintiff's First Amendment Claim**

Plaintiff alleges in his Complaint that Defendants violated the First Amendment when they did "not call[] a supervisor when Plaintiff asked . . . and . . . retaliat[ed] against Plaintiff for attempting to exercise his [F]irst Amendment rights with the use of excessive force." Defendants do not address Plaintiff's First Amendment claim and analyze his claim only under the rubric of the Eighth Amendment as one for excessive force. Nevertheless, the Court concludes on this record that Plaintiff has not established a claim for violation of the First Amendment.

The Ninth Circuit has held

> [w]ithin the prison context, a viable claim of
> First Amendment retaliation entails five basic
> elements:  (1) An assertion that a state actor
> took some adverse action against an inmate
> (2) because of (3) that prisoner's protected
> conduct, and that such action (4) chilled the
> inmate's exercise of his First Amendment rights,
> and (5) the action did not reasonably advance a
> legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2004) (citations omitted).

Plaintiff alleges in his Complaint that on August 26, 2013, he "asked for Officer Brooks to call the Sergeant so I could talk to him about being denied a shower. When Brooks refused, I took the cuffport 'hostage' so he would have to call the Sgt., but instead he slammed the door on my hand . . . and called for

Hickey's assistance."  In his Declaration in support of his
Opposition to Defendant's Motion, however, Plaintiff does not
testify that he asked to speak to a Sergeant and only states he
"was denied a shower."

Officer Brooks testifies on August 26, 2013, Plaintiff was
denied a shower and he "indicated to [Officer Brooks] that he
wished to speak with a sergeant."  Brooks Decl. at ¶ 3.  Officer
Brooks "told [Plaintiff that if] he needed [to, he] could speak
to a sergeant when the sergeant made their [sic] rounds."  Id.

Plaintiff also alleges in his Complaint that on August 31,
2013, he asked Officer Harrison to place Plaintiff's dinner in
the cuff-port restriction device "by [Plaintiff's] door rather
than the one by [his] next door neighbor's cell, since he was
being accused of throwing feces at a CO."  Compl. at ¶ 9.
Plaintiff alleges Officer Harrison refused and denied him dinner.
Plaintiff, therefore, asked Officer Harrison to call the Sergeant
"so we could resolve this issue several times but he refused to,
so at about 6:30 p.m. [Plaintiff] took the cuff port and the
restriction device hostage."  Compl. at ¶ 10.

Officer Harrison testifies in his Declaration that at dinner
time on August 31, 2013, he ordered Plaintiff to stand "against
the back-wall of the cell and [he] prepared to use the . . .
cuff-port device.  [Plaintiff,] however, refused to comply.  As a
result, he was not provided with his evening meal due to his

refusal to follow directives."  Officer Harrison does not
indicate whether Plaintiff asked to speak with a sergeant.

Assuming without deciding that requesting to speak with a
sergeant is protected conduct under the First Amendment,
Plaintiff has not established there is any genuine issue of
material fact as to whether Defendants injured Plaintiff because
of his request to speak with a sergeant.  As noted, Plaintiff
concedes he took the cuffport "hostage" on August 26 and 31,
2013, by putting his arms through the cuff port.  The Court finds
it was not a constitutionally unreasonable response to this
undisputed conduct for Officers Brooks and Harrison to perceive
Plaintiff's actions as an attempt to grab them or to reach
various items on their persons.  In addition, Plaintiff refused
to comply with the Officers' orders to pull his arms out of the
cuff port and back into his cell.

The Court concludes on this record that Plaintiff has not
established any issue of material fact that Defendants took any
adverse action against him because of his request to speak with a
sergeant and, in fact, the record reflects Defendant Officers
were reacting to Plaintiff taking the cuff-port hostage and did
so in the manner permitted under ODOC Regulations.

Accordingly, the Court grants Defendants' Motion for Summary
Judgment as to Plaintiff's First Amendment Claim.

## IV. Plaintiff's Eighth Amendment Claim

Although it is not entirely clear, it appears Plaintiff seeks to assert a claim for excessive force in violation of the Eighth Amendment arising from the events of August 26, 2013, and/or August 31, 2013.

### A.    Standards

"'[T]he unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)(quoting *Whitley v. Albers*, 475 U.S. 312 (1986)).  When prison officials are accused of using excessive physical force . . . in violation of the Eighth Amendment, "the core judicial inquiry" is "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)(quoting *Hudson*, 503 U.S. at 7).

The Ninth Circuit has held courts should consider five factors when determining whether the use of force was wanton and unnecessary:

> (1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response.

*Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003)(citing *Hudson,* 503 U.S. at 7).  "[C]ourts[, however,] must accord prison

20 - OPINION AND ORDER

administrators wide-ranging deference in the adoption and
execution of policies and practices to further institutional
order and security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).
*See also Jeffers v. Gomez*, 267 F.3d 895, 917 (9th Cir. 2001)
(same).

> **B.    August 26, 2013, Incident**

To the extent that Plaintiff asserts a claim for
violation of the Eighth Amendment related to the events that
occurred August 26, 2013, Defendants move for summary judgment on
the grounds that Plaintiff's injury was *de minimis* and the force
used by Officers Brooks and Hickey was not excessive.

When prison officials maliciously and sadistically use
force to cause harm, "'contemporary standards of decency always
are violated . . . whether or not significant injury is evident.
Otherwise, the Eighth Amendment would permit any physical
punishment, no matter how diabolic or inhuman, inflicting less
than some arbitrary quantity of injury.'"  *Id.* (quoting *Hudson*,
503 U.S. at 9).  Nevertheless, the Supreme Court has made clear
that the absence of serious injury is not irrelevant and that
"t]he extent of injury suffered by an inmate is one factor that
may suggest whether the use of force could plausibly have been
thought necessary in a particular situation."  *Id.* at 38
(quotation omitted).

> As we stated in *Hudson*, not "every malevolent
> touch by a prison guard gives rise to a federal

cause of action."   503 U.S. at 9, 112 S. Ct. 995.
"The Eighth Amendment's prohibition of 'cruel and
unusual' punishments necessarily excludes from
constitutional recognition *de minimis* uses of
physical force, provided that the use of force is
not of a sort repugnant to the conscience of
mankind."   *Ibid.* (some internal quotation marks
omitted).   An inmate who complains of a "push or
shove" that causes no discernible injury almost
certainly fails to state a valid excessive force
claim.   *Ibid.* (quoting *Johnson v. Glick*, 481 F.2d
1028, 1033 (2d Cir.1973)).

Injury and force, however, are only imperfectly
correlated, and it is the latter that ultimately
counts.   An inmate who is gratuitously beaten by
guards does not lose his ability to pursue an
excessive force claim merely because he has the
good fortune to escape without serious injury.
Accordingly, the Court concluded in *Hudson* that
the supposedly "minor" nature of the injuries
"provide[d] no basis for dismissal of [Hudson's]
§ 1983 claim."

*Id.*

The undisputed record reflects Plaintiff suffered only

bruising and scratches on his arm from the incident on August 26,

2013.   A number of district courts in the Ninth Circuit,

including courts in this district, have held injuries such as

those suffered by Plaintiff on August 26, 2013, are *de minimus*

and, as such, do not support a claim for violation of the Eighth

Amendment.   *See, e.g., Jordan v. Edwards*, No. CV 15-3125 DOC

(FFM), 2016 WL 2753389, at *5 (C.D. Cal. Apr. 18, 2016)("A shove

and rough handcuffing are relatively minor uses of force and are

far from 'repugnant to the conscience of mankind.'"); *Taylor v.*

*Johnson*, No. C 12-3424 CRB (PR), 2015 WL 6735309, at *3 (N.D.

Cal. Nov. 4, 2015)(loss of an artificial tooth on a partial
dental plate and a chip on a different artificial tooth were *de
minimum* injuries that did not support an Eighth Amendment claim);
*Anthony v. Shackmann*, No. 07-CV-698-HU, 2009 WL 1065071, at *4
(D. Or. Apr. 17, 2009), *vacated on other grounds*, 402 F. App'x
207 (9th Cir. 2010)(prison guard's open-handed blow to the
plaintiff's temple did not violate the Eighth Amendment); *Swift
v. Iramina*, No. 08-00100 JMS-KSC, 2008 WL 1912470, at *3 (D. Haw.
Apr. 29, 2008)(allegation that prison guard pushed plaintiff in
response to question did not state Eighth Amendment violation).
This Court likewise concludes the amount of injury Plaintiff
suffered on August 26, 2013, was *de minimus*.  Although the extent
of injury is not dispositive of Plaintiff's Eighth Amendment
claim, the Court finds that factor weighs in favor of Defendants.

    The undisputed record also reflects the second factor
regarding the need for application of force also weighs in favor
of Defendants.  As noted, Defendants have established the
potentially serious dangers and concerns of corrections officers
that arise when inmates reach through the cuff-port door or take
the cuff port "hostage" as Plaintiff did on August 26, 2013.  As
Captain Jost explained in his Declaration, the threats reasonably
perceived by corrections officers generally and Officers Brooks
and Hickey specifically are numerous and include an inmate
"crash[ing] the door of his cell and impart[ing] force on the

restriction device resting against it, thereby causing the device
to push back from the cuff port and allow[ing] the inmate to
reach through and grab at the officer, try to steal items off the
officer's duty belt, or throw something at the officer." Jost
Decl. at ¶ 14.  In addition, Officers Brooks and Hickey attempted
to temper the severity of their response.  They ordered Plaintiff
to pull his arms out of the cuff port and back into his cell.
When it became clear that Plaintiff was not going to comply,
Officers Brooks and Hickey stepped to the side of the cuff port
where Plaintiff could not reach them and waited for assistance
from Sergeant Johnson.

On this record the Court concludes Plaintiff has not
established any issue of material fact as to whether Defendants
used excessive force in violation of the Eighth Amendment on
August 26, 2013.

**C.  August 31, 2013, Incident**

Defendants also move for summary judgment as to
Plaintiff's excessive-force claim related to the August 31, 2013,
incident on the ground that the force used by Officer Harrison
was not excessive.

Defendants do not assert Plaintiff did not suffer a
serious injury when his arm was broken during the August 31,
2013, incident.  Defendants, however, point out that Officer
Harrison was aware of Plaintiff's prior interactions with

24 - OPINION AND ORDER

Officers Brooks and Hickey as well as Plaintiff's six previous disciplinary rule violations for Inmate Assault.  In addition, as noted Officer Harrison was aware of the potentially severe risks associated with inmates reaching out of the cuff port, and Officer Harrison "truly believed that [Plaintiff] was attempting to either injure him or trying to grab a possible weapon from [his] duty belt."  Harrison Decl. at ¶ 10.  Officer Harrison was alone on the floor and did not have backup immediately available to assist him when Plaintiff reached out of the cuff port and attempted to grab him.  The record reflects Plaintiff also grabbed Officer Harrison's arm and appeared to be attempting to pull Office Harrison's arm into his cell, an event that Officer Harrison had been trained to recognize as extremely dangerous for a corrections officer.  Even when viewed in the light most favorable to Plaintiff, the Court concludes the record establishes Officer Harrison reasonably perceived a serious threat when Plaintiff reached out of the cuff port and grabbed at him, which indicates there was a reasonable need for the application of force.  Moreover, Plaintiff has not introduced any evidence from which a rational trier of fact could find otherwise.  Accordingly, on this record the Court concludes Plaintiff has not established any issue of material fact that the force used against him by Officer Harrison on August 31, 2013, was excessive.

Accordingly, the Court grants Defendants' Motion for
Summary Judgment as to Plaintiff's Eighth Amendment claim for
excessive force.

**V.   Plaintiff's Claim for Inadequate Medical Care**

As noted, Plaintiff contends Defendants were deliberately
indifferent to his serious medical needs in violation of the
Eighth Amendment when they failed to provide him with sufficient
medical treatment and pain medication for his broken arm and when
they failed to provide him with sufficient mental-health
treatment.

Deliberate indifference to serious medical needs is a
cognizable claim for violation of the Eighth Amendment
proscription against cruel and unusual punishment. *Estelle v.
Gamble*, 429 U.S. 97, 104 (1976). *See also Colwell v. Bannister*,
763 F.3d 1060, 1066 (9th Cir. 2014)(same).

> To sustain [a] deliberate indifference claim, [a
> plaintiff must] meet the following test:  "First,
> the plaintiff must show a serious medical need by
> demonstrating that failure to treat a prisoner's
> condition could result in further significant
> injury or the unnecessary and wanton infliction of
> pain.  Second, the plaintiff must show the
> defendant's response to the need was deliberately
> indifferent."

*Peralta v. Dillard*, 704 F.3d 1124, 1127 (9th Cir. 2013)(quoting
*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).  To satisfy
the second prong (*i.e.,* that defendant's response to the need was
deliberately indifferent), a plaintiff must show there was "'(a)

a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm [was] caused by the indifference.'"  *Id.* (quoting *Jett*, 439 F.3d at 1096). Deliberate indifference may be established by showing that prison officials have denied, delayed, or intentionally interfered with medical treatment or by the way prison officials have provided medical care.  *Jett*, 439 F.3d at 1096.

"Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."  *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)(citation omitted).  *See also Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012)("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  In addition, "a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference."  *Wilhelm*, 680 F.3d at 1122 (quotation omitted).

## A.   Medical Care and Pain Medication

Plaintiff alleges he was denied adequate medical care and pain medication after his arm was broken.  Plaintiff asserts his humerus is bent inward and occasionally still causes him pain.  As noted, the undisputed facts show the following:

Plaintiff was admitted to the emergency room of the

27 - OPINION AND ORDER

Saint Alphonsus Medical Center on August 31, 2013, after his arm was broken.  Dr. Wilhemsen ordered Plaintiff to keep his arm in a splint and immobilized and to follow-up with an orthopedic surgeon within four to five days.  Plaintiff was discharged with instructions to take Norco (an acetaminophen-Hydrocodone combination) every six hours as needed.

On September 1, 2013, at 12:05 a.m. Plaintiff returned to SRCI.  Plaintiff's discharge instructions were given to Inmate Health Services, and Plaintiff was provided with pain medication. At 12:30 p.m. Plaintiff reported to Nurse Megan Ashton that the pain medication he had received was effective.  Plaintiff's arm was kept immobilized in a splint.

On September 3, 2013, after Plaintiff complained of breakthrough pain, Dr. Gulick prescribed MS Contin twice a day. Dr. Gulick also ordered an appointment for Plaintiff with Dr. Peterson to evaluate Plaintiff's arm to see whether surgery ORIF was necessary.

On September 4, 2013, Dr. Peterson noted Plaintiff's medial shaft was in "an excellent position" and directed Plaintiff to continue wearing the splint and to keep his arm immobilized.  Dr. Peterson also ordered Plaintiff to undergo follow-up x-rays in 1-2 weeks.

The record reflects Plaintiff was seen by various doctors and other medical staff at SRCI for treatment related to

28 - OPINION AND ORDER

his right-arm fracture at least 14 times between September 2013
and May 2014.   Plaintiff underwent x-rays of his right arm four
separate times between September 2013 and May 2014.   All of his
x-rays showed normal healing with only "slight malalignment"
within acceptable medical parameters.   Plaintiff's final x-ray on
May 15, 2014, showed

> fusion of the oblique fracture of the middiaphysis
> with smooth cortical lines and only slight
> malalignment (acceptable alignment of a humeral
> shaft fracture is considered to be 3 centimeters
> of shortening, 30 degrees of varus/valgus
> angulation (bowing of the bone), and 20 degrees of
> anterior/posterior angulation).   There was no
> periostitis seen and no osseous destructive
> lesions noted.   The shoulder and elbow
> articulations were intact.

Gulick Decl. at ¶ 42; Ex. 1 at 12.

Similarly, Plaintiff's narcotic pain medications were
reviewed and renewed numerous times until January 29, 2014, when
corrections officers found a "cache" of discontinued medications
hidden in the toilet in Plaintiff's cell.   After January 29,
2014, Plaintiff was prescribed Tylenol and anti-inflammatories
for pain regularly.

Viewing the evidence in the light most favorable to
Plaintiff, the Court concludes a reasonable juror could not find
on this record that Defendants were deliberately indifferent to
Plaintiff's serious medical needs with respect to the treatment
of his broken arm and the administration of medication.
Plaintiff, therefore, has not established Defendants violated

29 - OPINION AND ORDER

Plaintiff's rights under the Eighth Amendment.

**B.    Mental-Health Treatment**

In his Complaint Plaintiff also alleges Defendant
Richard Powelson was deliberately indifferent to his serious
mental- health needs when he did not authorize a "BHS radio" for
Plaintiff following surgery.  Specifically, Plaintiff alleges in
his Complaint that he advised Powelson that he could not read due
to the narcotics he was taking for pain, and he could not write
or "move around" due to pain.  Plaintiff alleges Powelson
"promised to have the Inmate Program Committee or Security
authorize . . . a BHS radio."  Compl. at ¶ 27.  Powelson,
however, never asked for a radio.

Powelson testifies in his Declaration that he was a
qualified mental-health specialist for the Behavior Health
Services (BHS) unit at SRCI during the relevant period.  On
September 1, 2013, he met with Plaintiff, who told Powelson that
he was "not doing well, apparently due to his . . . loss of
privileges."  Decl. of Richard Powelson at ¶ 2.  Plaintiff "asked
BHS to approve a radio 'or there is going to be some real
trouble.'"  Powelson Decl. at ¶ 2.  Powelson notes in his
Declaration that Plaintiff had an MP3 player at the time of his
request for a radio.  Powelson testifies radios are distributed
by SRCI security staff "as a reward or incentive to inmates in
exchange for reaching a certain level and/or maintaining a period

30 - OPINION AND ORDER

of good conduct." *Id*.  Powelson asked security about getting Plaintiff a radio, but "they were not in favor of it because of his recent misconduct.  [Plaintiff], like other inmates, had the ability to get a radio so long as he followed the rules and completed requisite programming to earn a radio."  *Id*.

As noted, in order to sustain a claim for deliberate indifference in violation of the Eighth Amendment, Plaintiff "must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Peralta*, 704 F.3d at 1127.  Viewing the evidence in the light most favorable to Plaintiff, the Court concludes Plaintiff has not established any issue of material fact as to whether the failure to provide him with a radio could result in a significant injury to him or in the unnecessary or wanton infliction of pain. Plaintiff, therefore, has not established Defendants violated Plaintiff's rights under the Eighth Amendment when Powelson failed to provide Plaintiff with a radio.

Accordingly, the Court grants Defendants' Motion for Summary Judgment.

## <u>CONCLUSION</u>

For these reasons, the Court **GRANTS** Defendants' Motion (#55) for Summary Judgment and **DISMISSES** this matter **with**

**prejudice.**

IT IS SO ORDERED.

DATED this 1st day of July, 2016.

_____
ANNA J. BROWN
United States District Judge

32 - OPINION AND ORDER